_____
BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

```
In re:                        )
                              )
Fall Creek One, LLC,          )    Case No. 24-80221
                              )
            Debtor.           )    Chapter 11
                              )
```

## OPINION AND ORDER VALUING SECURED CLAIM
## OF MARINE FEDERAL CREDIT UNION

This case came before the Court for hearing on April 1, 2025, on the Motion to Value Secured Claim filed by Marine Federal Credit Union ("Creditor") on January 14, 2025. ECF No. 74 (the "Motion"). Counsel for Debtor, counsel for Creditor, and the U.S. Bankruptcy Administrator appeared at the hearing. At the conclusion of the hearing, the Court took this matter under advisement. For the reasons state herein, the Court will value the secured claim of Creditor in the amount of $3,794,314.89.

### BACKGROUND

Debtor commenced this case by filing a voluntary petition under chapter 11 on September 27, 2024. ECF No. 1. Debtor is a North Carolina limited liability company, established in 2022 to

acquire real property in Purlear, North Carolina. ECF No. 69, at
4. Prepetition, in October 2022, Debtor purchased real property
located at 1105 Fall Creek Road, Purlear, North Carolina (the "Real
Property") for $3,000,000.00. Id. To finance this purchase,
Debtor executed a promissory note in favor of Creditor in the
original principal amount of $1,950,000.00. Id. The promissory
note is secured by a deed of trust on the Real Property. Id. In
October 2022, Debtor refinanced its obligation to Creditor and
entered a promissory note in the original principal amount of
$4,438,000.00 to fund the costs of renovating preexisting cabins,
constructing ten glamping pods, and constructing treehouses, all
of which were to be located on the Real Property and used as short-
term rental properties. Id. This promissory note granted Creditor
a lien on substantially all of Debtor's now-owned and after-
acquired personal property (collectively with the Real Property,
the "Collateral"). Id. Debtor ceased making loan payments to
Creditor in November 2023, and Debtor's chapter 11 filing followed.
Id. at 4-5. On December 18, 2024, Creditor filed Claim No. 5,
asserting a secured claim in the amount of $4,310,000.00, an
unsecured claim in the amount of $598,937.00, and a total claim in
the amount of $4,908,937.00. Claim No. 5-1.

On January 7, 2025, Debtor filed its Plan of Reorganization,
ECF No. 68 (the "Plan"), proposing to retain the Collateral and
treat Creditor's claim as secured in the amount of $2,000,000.00.

2

Id. at 10.  Debtor contends in the Plan that this amount represents the fair market value of the Collateral as of the effective date of the Plan.  Id.  Contemporaneously with the filing of the Plan, Debtor filed its Disclosure Statement.  ECF No. 69.  According to the Disclosure Statement, there are currently eight cabins located on the Real Property, seven of which are available for rent.  ECF No. 69, at 6.  The remaining cabin requires approximately $16,500.00 in roof repairs before it can become available for rent. Id.  Debtor states in its Disclosure Statement that it anticipates these repairs will be completed in early 2025 after confirmation of the Plan.  Id.  Debtor further states that the ten glamping pods are approximately 90 percent complete, and that it anticipates that these pods will be completed and available for rent approximately four months after confirmation of the Plan.  Id. Debtor no longer contemplates constructing the treehouses.  Id.

On January 14, 2025, Creditor filed the Motion, seeking a determination of the value of the Collateral at an amount of at least $4,100,000.00.  ECF No. 74, ¶ 9.  At the hearing on the Motion, each party called an expert witness to testify to their independent appraisals of the Collateral.  The parties stipulated that both appraisers are experts in the field of real estate appraisal.  ECF No. 97.  Creditor's witness appraised the Collateral at a value of $4,360,000.00, while Debtor's witness

appraised the Collateral at a value of $2,460,000.00.  <u>See</u> Ex. 1
& Ex. 2.

**DISCUSSION**

11 U.S.C. § 506(a)(1) provides:

> An allowed claim of a creditor secured by a lien on
> property in which the estate has an interest . . . is a
> secured claim to the extent of the value of such
> creditor's interest in the estate's interest in such
> property . . . and is an unsecured claim to the extent
> that the value of such creditor's interest . . . is less
> than the amount of such allowed claim.  Such value shall
> be determined in light of the purpose of the valuation
> and of the proposed disposition or use of such property,
> and in conjunction with any hearing on such disposition
> or use or on a plan affecting such creditor's interest.

In other words, "a claim is secured only to the extent of the value
of the property on which the lien is fixed," and any amount of the
claim that exceeds the value of the collateral is considered
unsecured.  <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235,
239 (1989).  "Accordingly, when an allowed claim is undersecured—
when the claimed amount exceeds the value of the property securing
the claim—'Section 506(a)(1) requires the bifurcation of the claim
into two components: a secured claim for the value of the
collateral, and an unsecured claim for the balance.'"  <u>Hurlburt v.</u>
<u>Black</u>, 925 F.3d 154, 159 (4th Cir. 2019) (quoting <u>In re Price</u>, 562
F.3d 618, 623 (4th Cir. 2009)).

Neither the Bankruptcy Code nor the Federal Rules of
Bankruptcy Procedure assigns the burden of proof for a motion to
determine the value of a secured claim.  <u>In re Dunson</u>, 515 B.R.

4

387, 390 (Bankr. N.D. Ga. 2014). Instead, "'[t]he circumstances will dictate the assignment of the burden of proof on the question of value.'" Id. (quoting In re Young, 390 B.R. 480, 486 (Bankr. D. Me. 2008)). "Courts disagree as to the proper placement of the burden of proof when the creditor's interest in property is being valued to determine whether a plan is confirmable." Id. (collecting cases). In this case, because Debtor's Plan proposes to value Creditor's claim at $2,000,000.00, ECF No. 68, and Debtor will ultimately have the burden of establishing the elements of 11 U.S.C. § 1129(a) at confirmation, the Court will place the burden of proof on Debtor for purposes of determining the value of Creditor's secured claim. See 11 U.S.C. § 1129(a)(7)(B); see also Dunson, 515 B.R. at 390 (gathering cases and determining that the debtor caries burden of proof in a proceeding under § 506 to value collateral for purposes of plan confirmation); In re El Charro, Inc., No. 05-60294, 2007 WL 2174911, at *4 (Bankr. D. Kan. July 26, 2007) (same).

## I. Standard of Valuation: Fair Market Value Upon Completion of Glamping Pods

The Court "has a duty to value property under § 506 even where the appraisals reach very different conclusions." In re Godwyn, 651 B.R. 669, 675 (Bankr. E.D.N.C. 2023). "Valuation 'is not an exact science,' and the court must use its judgment in forming a determination as to the value of the [p]roperty." In re Demery,

623 B.R. 175, 179 (Bankr. M.D.N.C. 2020) (quoting In re Brown, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003)). "Often, multiple appraisers provide conflicting valuations, and '[w]hen two appraisal reports conflict, a court must determine the value based on the credibility of the appraisers, the logic of their analys[es] and the persuasiveness of their subjective reasoning.'" In re Blackwell, No. 2:17-BK-20203, 2018 WL 1189257, at *2 (Bankr. S.D.W. Va. Mar. 5, 2018) (quoting In re 3G Props., LLC, No. 10-04763-8-JRL, 2011 WL 5902504, at *8 (Bankr. E.D.N.C. July 12, 2011)). However, "a court need not wholly accept the value of one appraiser over another—it can arrive at its own conclusion as to value based on its own interpretation of the evidence." Id. In weighing conflicting appraisal testimony, courts look to factors such as "the appraiser's education, training, experience, familiarity with the subject of the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented." Id. Although with less weight, some courts have considered the debtor's opinion as the property owner. See, e.g., In re Myers, 631 B.R. 392, 395 (Bankr. D.S.C. 2021). The property owner's opinion of value is admissible "even when the owner is a corporation and the valuation testimony comes from a designated corporate officer." United States v. 10,031.98 Acres of Land, More or Less, Situate in Las Animas Cnty., Colo., 850 F.2d 634, 639 n.4 (10th Cir. 1988)

(collecting cases).  Courts apply heightened scrutiny when two qualified appraisers present appraisals with widely divergent values.  <u>In re Diamond Beach VP, LP</u>, 506 B.R. 701, 717 (Bankr. S.D. Tex. 2014), <u>aff'd</u>, 551 B.R. 590 (S.D. Tex. 2016).

Value under § 506(a)(1) must be determined in light of the purpose of the valuation and of the proposed disposition or use of the property.  "In a reorganization proceeding under Chapter 11 of the Bankruptcy Code, the 'proposed disposition and use' of the property is ascertainable from the debtor's chapter 11 plan."  <u>In re Deep River Warehouse, Inc.</u>, No. 04-52749, 2005 WL 1287987, at *7 (Bankr. M.D.N.C. Mar. 14, 2005) (quoting § 506(a)(1)).  Where a debtor's chapter 11 plan proposes to retain property, the proper standard of valuation is the fair market value of the property. <u>Id.</u> at 8.  "Fair market value is determined by considering the property's 'highest and best use,' which is the 'highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'"  <u>United States v. 15,478 Square Feet of Land, more or less, situate in the City of Norfolk, VA</u>, No. 2:10-CV-00322, 2011 WL 2471586, at *6 (E.D. Va. June 20, 2011) (quoting <u>Olson v. United States</u>, 292 U.S. 246, 255 (1934)).  Courts determine the appropriate date of valuation on a case-by-case basis.  <u>Matter of Hous. Reg'l Sports Network, L.P.</u>, 886 F.3d 523, 531 (5th Cir. 2018).

In this case, the purpose of the valuation is to determine the value of Creditor's secured claim, ECF No. 74, and Debtor proposes to retain the Collateral in the Plan.  ECF No. 68.  Both parties have agreed that the highest and best use of the Collateral is its current use, short-term rentals, after repairing the remaining cabin and completing the glamping pods (collectively, the "Development Plans").  See Ex. 1, at 77-78; Ex. 2, at 68-69. Therefore, the proper standard of valuation of the Collateral is its fair market value upon completion of the Development Plans and the continued use of the property for short-term rentals.  Debtor estimates that the Development Plans will be completed within four months of confirmation of the Plan.  ECF No. 69, at 6.  The hearing on Debtor's Disclosure Statement is set for May 28, 2025.  ECF No. 79, ¶ 5.  Thus, the earliest that the Plan could be confirmed is June 25, 2025,[1] and the earliest date that the Development Plans may be completed is October 25, 2025.

## II.  Method of Valuation: Income Approach

The price paid for collateral at a commercially reasonable sale is the best evidence of fair market value.  In re Flores De N.M., Inc., 151 B.R. 571, 576 (Bankr. D.N.M. 1993).  Debtor's plan proposes to retain the collateral, make periodic cash payments,

---

[1] See 11 U.S.C. § 1125(b); Fed. R. Bankr. P. 2002(b)(2) ("the clerk or the court's designee must give the debtor, trustee, all creditors, and all indenture trustees at least 28 days' notice by mail of . . . the time of the hearing to consider whether to confirm . . . a Chapter 11 plan").

and provide for Creditor to retain its lien until its secured claim is satisfied.  Therefore, "the value of property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."  Associates Comm'l Corp. v. Rash, 520 U.S. 953, 960 (1997); see also In re Murray Metallurgical Coal Holdings, LLC, 618 B.R. 220, 237 (Bankr. S.D. Ohio 2020) (Rash is particularly relevant to the valuation of collateral in cram-down chapter 11 cases where the debtor proposes to retain the collateral and make deferred cash payments).  In other words, the fair market value should be determined based on the price a buyer would pay to use the property for the same use. See Dunson, 515 B.R. at 391.

The testimony of the appraisers in this case presented three possible methods of valuing the Collateral.  First, the cost approach considers the costs to replace existing structures on the property, less the current cost to purchase the existing structures and make necessary modifications.  In re Virtual Citadel, Inc., 113 F.4th 1304, 1311 (11th Cir. 2024).  This approach is used to value special-purpose properties as well as properties that are not often exchanged in the market.  Id.  Second, the sales comparison approach values a property using data from recent sales of comparable properties.  Id.  This approach is disfavored for determining value of unique assets for which comparable sales are

limited or do not exist. Id.[2] Finally, the income approach values a property by capitalizing the anticipated future income from owning the property. Id. This approach is often used when a debtor intends to retain collateral to generate income. See, e.g., Dunson, 515 B.R. at 391 (applying income approach where debtors intended to retain rental property as a source of income because this approach "considers what an investor in [the property], such as the [d]ebtors, would pay a seller to acquire such properties"); see also In re Henry, 457 B.R. 402, 407 (Bankr. E.D. Pa. 2011) (if the property that secures a creditor's claim was purchased for a non-consumer purpose, then the property's value should be determined from the perspective of the debtor).

Both appraisers weighed the different value indications resulting from using these different approaches to value. Ex 1, at 120-21; Ex. 2, at 89. Debtor's appraiser reconciled to the sales comparison approach based on his opinion that this approach is a common methodology among market participants. Ex. 2, at 89. In contrast, Creditor's appraiser reconciled to the income capitalization approach because he contends that an investor is the most likely purchaser of the Collateral, and a typical investor would place greatest reliance on the prospective income they could

---

[2] When courts apply the sales comparison approach, they must closely scrutinize the comparable properties selected. In re Hotel Assocs., LLC, 340 B.R. 554, 561 (Bankr. D.S.C. 2006).

realize from the Collateral.  Ex. 1, at 120-21.  Debtor proposes
to retain the Collateral as a source of income.  See ECF Nos. 68
& 69.  Thus, when considering value from the perspective of Debtor,
the better indicator of value is the anticipated income that the
Collateral will create as opposed to the value it would realize in
a sale.  Therefore, the Court will apply the income approach.

Under the income approach, the present value of future income
is determined by: (1) estimating future income, (2) deducting
expenses, and (3) applying a capitalization rate.  Diamond Beach
VP, 506 B.R. at 715.  Both appraisers use the same capitalization
rate; the dispute is with regards to the estimates of future income
and expenses.  See Ex. 1, at 103-19; Ex. 2, at 71-78.

Each appraiser bases his estimate of Debtor's future gross
income on an aggregation of data from rental property websites as
well as historical data from Debtor's prepetition operations, but
each appraiser made different assumptions in interpreting the
data.  This divergence of assumptions created significant
differences in value.  Each appraiser based his appraisal in part
on an estimate of Debtor's future occupancy rate and average daily
rate ("ADR").  Having considered the testimony of each appraiser,
and the data contained in each appraiser's report, the respective
determinations of occupancy rate and ADR are based on unreliable
assumptions about the data.  Debtor's appraiser relied on data
from properties which he conceded were not comparable to Debtor's

11

property, and he made no attempt to distinguish between Debtor's property and the "comparable" properties. See ECF No. 98, at 0:12:00-0:13:00. The projections of Debtor's appraiser regarding occupancy rate and ADR lead to a projected net income which is substantially lower than the net income that Debtor projected in its Disclosure Statement. Compare Ex. 2, at 78, with ECF No. 69, at 38-43. As noted by the U.S. Bankruptcy Administrator at the hearing, it is problematic for Debtor to rely on one value for plan projections and feasibility but a lower value when to Debtor's benefit in the context of "cramming down" Creditor's secured claim.[3] ECF No. 98, at 00:41:00-00:42:30.

Similarly problematic, Creditor's appraiser selected a small pool of comparable properties but opted to apply an occupancy rate and ADR found on the higher end of the pool. See Ex. 1, at 108-09. This creates the possibility of an inflated projected rental income because ADR and occupancy rates tend to be inversely related. See In re Kinser Grp. LLC, No. 2:20-BK-09355-DPC, 2020 WL 7633854, at *5 (Bankr. D. Ariz. Dec. 18, 2020) ("Higher ADR will likely push down occupancy and vice versa."). Creditor's own

---

[3] This discrepancy goes to the credibility of the projections of Debtor's appraiser and the feasibility of the Plan. At the valuation hearing, no evidence was offered in support of Debtor's projections other than the deemed admission in the filed and signed Disclosure Statement with this Court. See ECF No. 98, at 00:17:00-00:27:00. Debtor's appraiser testified that he did not ask Debtor's principals or its management team about their expected revenue or expenses, which further undermines the reliability of his assumptions regarding future performance and ADR.

appraisal recognizes this inverse relationship. Ex. 1, at 108. While Creditor's pool of comparable properties is more reliable than Debtor's pool of non-comparable properties, Creditor's appraiser's explanation for why he chose higher values for occupancy rate and ADR was conclusory and insufficient, stating that he thought the Real Property was on the nicer end of comparable properties. ECF No. 99, at 0:41:30-0:46:00. Therefore, has not given prevailing weight to the selection of the ten best performing properties from the data. Cf. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 157 (1999) (affirming exclusion of expert witness whose testimony was connected to existing data only by the ipse dixit[4] of the expert).

The record demonstrates that Debtor's historical performance is an unreliable indicator of Debtor's future performance. Debtor has made statements to this effect many times throughout this case, contending that Debtor's historical performance was affected by poor management, a terminated manager, and a hurricane, and that Debtor's future performance will improve due to developments to the Real Property that will increase available units. See, e.g., ECF No. 69, at 4-7. Debtor also has represented to the Court that

---

[4] "Something asserted but not proved .... The phrase is commonly used in court decisions analyzing the admissibility of expert testimony. A court may reject expert-opinion evidence that is connected to existing data only by the expert's **'ipse dixit.'**" *Ipse dixit*, Black's Law Dictionary (12th ed 2024).

its management is experienced in operating properties like the Real Property.

Since the Court is unable to rely on either appraiser's projections for occupancy and ADR or Debtor's historic performance, it must find a better basis on which to project occupancy and revenue on the record before it. Debtor's ownership and management are experienced in managing and investing in short-term rental properties, id. at 4, and the feasibility of Debtor's plan depends on Debtor performing as it projects. Importantly, the standard of valuation requires the Court to consider what the debtor would pay to obtain like property from a willing seller. Rash, 520 U.S. at 960. The best indication of what the debtor projects as income and expenses, which forms the basis of valuation according to both appraisers, is the debtor's own projections on which it relies for confirmation. If Debtor were considering the price it would pay to obtain this property, it would base its decision on its projections of revenue for the property. In this case, it is particularly appropriate to consider Debtor's projections as a basis for valuation because Debtor has even better information about its own operations than it would if it were simply a third party relying on due diligence. Although Debtor's projections are the best evidence of projected income and expenses, the price actually paid by Debtor's investment group also is a relevant consideration that supports reliance on Debtor's

projections when determining what Debtor would be willing to pay to obtain the property.[5]

Creditor's appraiser testified that the appropriate twelve-month period to consider for purposes of current valuation was after completion of the improvements and stabilization of income. This testimony was credible, and the Court accepts it. The record indicates that this twelve-month period will begin four months after confirmation, or October 2025. In the Disclosure Statement, Debtor projects that its gross income for the year beginning October 2025 and ending September 2026 will be $799,904.18. ECF No. 69, at 38-43. Debtor projects that its total expenses for that same period will be $430,015.26.[6]   Id.   Thus, Debtor's projected net income for this twelve-month period is $369,888.82. Applying the nine percent capitalization rate, to which each expert agreed, to this figure results in a present value of $4,109,876.89. Deducting from this value the costs to complete the Development

---

[5] The testimony from both appraisers was that there has been a decline in the market for short-term rentals since the COVID-19 national emergency subsided. Nevertheless, the property was acquired after the crises had largely abated, and Debtor's plan projections were made with knowledge of the current market.

[6] Relying on the categories of expenses in the appraisal reports, the Court includes the following expenses from Debtor's Disclosure Statement in this calculation: Administrative, Advertising and Marketing, Insurance, Landscaping, Payroll and Personal Costs, Repairs and Maintenance, Taxes, and Utilities. See ECF No. 69, at 38-43. The Court also included a management fee expense of $104,139.80. The Court determined the appropriate amount for this expense by deducting Debtor's projected booking fees ($105,638.83) from Debtor's projected Rental Fee Income ($799,904.18) and calculating 15 percent of this difference ($104,139.80). Id. This method allows the Court to use the categorical listing of appropriate expenses provided by Creditor's appraiser, Ex. 1, at 111, while also using Debtor's projections.

15

Plans of $315,562.00,[7] yields a fair market value of the Collateral under the income approach of $3,794,314.89. This conclusion is consistent with the actual price paid by Debtor to obtain the property, giving additional consideration to improvements that have been made. Debtor purchased the Real Property in 2023 for $3,000,000.00. Id. Since the purchase, Debtor has put $1,825,000.00 into renovating the cabins and constructing the glamping pods, Ex. 2, at 6, and contemplates spending an additional $290,000.00, Ex. 2 at 78, to $315,562.00 to complete the project. Ex. 1, at 119.

NOW, THEREFORE, it is hereby ORDERED, ADJUDGED, AND DECREED that the value of the Real Property is $3,794,314.89, and Creditor holds an allowed secured claim in that amount.

[END OF DOCUMENT]

---

[7] Debtor's appraisal estimates the cost to complete the Development Plans to be $290,000.00, Ex. 2, at 78, whereas Creditor's appraisal estimates this cost to be $315,562.00. Ex. 1, at 119. Debtor's appraisal states that $290,000.00 is the cost to complete the glamping pods. Ex. 2, at 68. In addition to the cost to complete the glamping pods, Creditor's appraisal also includes the cost to repair the cabin roof, as Debtor stated was necessary in the Disclosure Statement, ECF No. 69, at 6, and tree removal. Ex. 1, at 47. Because Creditor's estimate of completion costs is more holistic and better aligns with Debtor's own Disclosure Statement, the Court will reconcile to Creditor's estimate of $315,562.00.

PARTIES TO BE SERVED
Case No. 24-80221

John Paul Hughes Cournoyer
U.S. Bankruptcy Administrator          via electronic notice

Kenneth Lautenschlager
Counsel for Creditor                   via electronic notice

Laurie B. Biggs
Counsel for Debtor                     via electronic notice